IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARRIET LIPSCHULTZ | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 15-5760 |
| HOLY FAMILY UNIVERSITY | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                       **FEBRUARY 17 , 2017**

Presently before the Court is Defendant's Motion for Summary Judgment. (ECF No. 20.) For the following reasons, the Motion will be denied.

**I.      BACKGROUND**

After she was terminated as an adjunct Spanish professor, Plaintiff Harriet Lipschultz brought this retaliation claim against Defendant Holy Family University under the Age Discrimination in Employment Act ("ADEA"). Upon review of the summary judgment record, and resolving all disputes in favor of Plaintiff, we conclude that Plaintiff has presented sufficient evidence of retaliation to survive summary judgment.

**A.      Factual Background**

Plaintiff is sixty-eight years old. (Compl. ¶ 1, Notice of Removal, ECF No. 1.) She formerly served as an adjunct Spanish Professor at Holy Family for approximately ten years, from 2002 until 2012. (Lipschultz Dep. 35, Pl.'s Resp. Ex. E, ECF No. 22.) During her ten years at Holy Family, Plaintiff taught multiple classes every semester, including the Summer semester. (*Id*.) Like all adjunct faculty at Holy Family, Plaintiff was hired on a semester-to-semester basis. (Lipschultz Dep. 35.) Plaintiff received numerous positive evaluations from students during her time at Holy Family. (Student Evals., Pl.'s Resp. Ex. B.) In December 2006,

the Dean of the School of Arts and Sciences wrote a letter of recommendation on behalf of Plaintiff.  (*Id*.)  The letter stated that Plaintiff "is a dedicated educator" who "handles her classes with ease and good humor."  (*Id*.)  The letter further states that Plaintiff's "student evaluations attest to her teaching excellence and her ability to facilitate academic growth in students."  (*Id*.)

Despite a history of success at Holy Family, Plaintiff was informed on March 13, 2012, that her services as an adjunct Spanish professor would no longer be needed.  (Mar. 12, 2012 E-mail, Pl.'s Resp. Ex. C.)  Michael Markowitz, the Dean of the School of Arts of Sciences at Holy Family at that time, stated in an e-mail to Plaintiff that, because the University "expanded [its] roster of part-time faculty, [it is] rotating teaching opportunities among all those involved to ensure the highest quality and greatest diversity of instruction."  (*Id*.)[1]

In October of 2013, after Holy Family decided to not renew Plaintiff's adjunct professor contract, Plaintiff filed an age discrimination lawsuit against her former employer in the Philadelphia Court of Common Pleas.  (Settlement Agmt., Pl.'s Resp. Ex. D.)  The parties settled the lawsuit in June 2014.  (*Id*.)  As part of the Settlement Agreement, Holy Family agreed to pay Plaintiff a small monetary sum, and also agreed to permit Plaintiff to teach two introductory Spanish courses during the Fall 2014 semester.  (*Id*.)  Specifically, the Settlement Agreement stated:

> The University shall appoint and assign [Plaintiff] to teach two Introductory Spanish courses during the Fall 2014 semester, beginning on August 27, 2014 and ending on December 17, 2014.  Such appointment shall be set forth in the University's standard appointment letter . . . .  This appointment and assignment of classes to [Plaintiff] shall not be construed to constitute an offer, promise, or guarantee of further or continuing assignments other than those offered.

---

[1] Plaintiff alleges in her Complaint that Holy Family replaced Plaintiff with an adjunct professor who was approximately half of Plaintiff's age.  However, there is no evidence in the record to support this allegation.  Therefore, we will not consider it a part of the summary judgment record.

(*Id*.) After the parties entered into the Settlement Agreement, Markowitz—who at that time was the Vice President of Academic Affairs—called Rochelle Robbins, the Dean of Arts and Sciences, and instructed her to make two introductory Spanish classes available to Plaintiff during the Fall semester. (Robbins Dep. 95, Pl.'s Resp. Ex. G.)[2] During this conversation, Markowitz informed Dean Robbins about Plaintiff's discrimination lawsuit, including the Settlement Agreement, which required Holy Family to provide two classes to Plaintiff during the Fall semester. (Robbins Dep. 66-67.) Markowitz also informed Dean Robbins that the Settlement Agreement was meant to provide Plaintiff two classes, but that "anything beyond the two sections would be entirely up to [Dean Robbins]." (*Id*. at 67.)

On June 4, 2014, Holy Family sent Plaintiff a letter confirming her appointment as a "part-time lecturer in the School of Arts and Sciences at Holy Family University for the Fall 2014, semester, beginning August 27, 2014 and ending December 17, 2014." (June 4 Ltr., Pl.'s Resp. Ex. H.) The June 2014 appointment letter is nearly identical to appointment letters Plaintiff received from Holy Family during prior years serving as an adjunct professor. (*See* Pl.'s Resp. Ex. I.)

Prior to the start of the Fall semester, on July 24, 2014, Plaintiff met with Dean Robbins and Assistant Dean Stokes-Dupass to discuss the use of Holy Family's learning management system and to obtain a copy of the textbook. (Robbins Dep. 15, 17; Lipschultz Dep. 14-15; July

---

[2] Dean Robbins became the Dean of Arts and Sciences on July 1, 2013. (Robbins Dep. 8-9.) Prior to that, she served as an Associate Dean, as the Department Head of Math and Sciences, as a Psychology professor, and as an adjunct professor in Psychology. (*Id*.) Dean Robbins's duties included "everything from staffing, to budget, to curriculum and program development, faculty evaluations, [and] faculty development." (*Id*. at 11-12.) Dean Robbins was specifically tasked with hiring and firing adjunct faculty and deciding "whether or not to re-engage adjunct faculty from semester to semester." (*Id*. at 12.) Dean Robbins has full discretion to decide whether Holy Family chooses to re-engage adjunct faculty. (*Id*.) She makes this decision after receiving feedback from the Associate Dean, Nicole Stokes-Dupass, and the Assistant Dean, Sister Marcella Louise Wallowicz. (*Id*. at 15-16.)

3

24, 2014 E-mail, Pl.'s Resp. Ex. L.)  After the meeting, Dean Robbins sent Plaintiff an introductory Spanish course syllabus that was prepared by Dr. Leticia Díaz, and suggested that Plaintiff model her syllabus off of the Díaz syllabus.  (July 24 E-mail; Robbins Dep. 77.)  Plaintiff took Dean Robbins's advice and drafted a syllabus that was nearly identical to the Díaz syllabus.  (Lipschultz Syllabus, Pl.'s Resp. Ex. M; Díaz Syllabus, Pl.'s Resp. Ex. L.)  There were two differences between Plaintiff's syllabus and Díaz's syllabus:  Plaintiff did not use Díaz's assessment grid, and Plaintiff did not include a date for the students' oral presentation.  (Lipschultz Syllabus; Díaz Syllabus.)

Adjunct professors must have a syllabus.  (Robbins Dep. 27-28.)  According to the Adjunct Handbook:

> Each faculty member must submit two copies of a course syllabus to the School Dean prior to the first class meeting.  Although the form and content of the outline may vary with the subject matter, a common syllabus below displays requirements and offers suggestions to facilitate the preparation of your course outline.

(Handbook 9, Pl.'s Resp. Ex. N.)  The Adjunct Handbook also provides that "course syllabi must include the Academic Honesty Policy and Disability Accommodations sections."  (*Id.*)  Dean Robbins testified during her deposition that other mandatory components of a syllabus include:  a list of learning objectives; the course description; the name, section number, and semester of the course; contact information; information about the textbook; a description of the work required of the student; the grading policy; and a grid for assessment, which informs the students how they will be assessed based on the learning objectives.  (Robbins Dep. 28-29.)

Holy Family asks that adjunct faculty upload their syllabus to its online education management system.  (Robbins Dep. 33.)  Once the syllabi are uploaded, they are randomly reviewed to assure that the mandatory components are present.  (*Id*. at 33-34.)  If it is discovered

that a syllabus is lacking a mandatory component, the syllabus is returned to the adjunct faculty member to be revised. (*Id*. at 34.) Plaintiff's Fall 2014 syllabus was not one that was marked as "flagged" or "problematic" after a random search of the syllabi. (*Id*. at 80-81.)

When Dean Robbins began as Dean in 2013, she instituted an evaluation policy for adjunct professors. (*Id*. at 18, 19.) During their first semester teaching, adjunct professors will undergo an evaluation. (*Id*. at 17.) Each adjunct is subsequently reviewed every three years. (*Id*.) In addition, adjunct professors are reviewed if problems arise, such as when a student complains about the professor. (*Id*.) The Adjunct Handbook states that "[k]ey factors for assessment of adjunct faculty" include "classroom visitation, evaluation of course planning (syllabus), examination of grading practices, cooperation with due dates, review of student performance and other applicable items . . . ." (Handbook.) Dean Robbins personally evaluates at most one adjunct professor per semester, and only those professors that have been identified as "having problems." (Robbins Dep. 23 (noting that it is her "job . . . to handle the more difficult cases.").) From July 1, 2013, through June 22, 2016, Dean Robbins conducted approximately five to ten adjunct evaluations. (*Id*. at 41-42.)

When she evaluates a professor through in-class observation, Dean Robbins "look[s] for organization, student engagement" and a "diversity of pedagogies." (Robbins Dep. 48.) With regard to "diversity of pedagogies," Dean Robbins explained that she looks to see if the professor is "just standing and lecturing to the class for an hour and a half, or are there different components of the class, where students are more interactive." (*Id*.) Dean Robbins testified that she has no written criteria that she follows when conducting in-class observations of adjunct professors. (*Id*. at 50-51.)

In October 2014, Plaintiff met with a student in the faculty lounge at Holy Family for tutoring and to discuss the student's grade. (Lipschultz Dep. 20-21, 29.) During Plaintiff's time at Holy Family, the faculty room had frequently been used to meet with and tutor students. (*Id*. at 29-30.) When Dean Robbins witnessed Plaintiff in the faculty lounge with the student, she asked Plaintiff to meet in her office. (*Id*. at 20.) There, Dean Robbins "chastised" Plaintiff for permitting a student in the faculty lounge and for discussing the student's grade around other people. (*Id*. at 20-21.) Dean Robbins believed this could violate the Family Educational Rights and Privacy Act ("FERPA"). (*See* Robbins Dep. 82-83.) Holy Family does not have a written policy that prohibits adjunct professors from meeting with students in the faculty lounge. (*Id*. at 84.) Rather, Dean Robbins decided it should be a school policy after she became Dean. (*Id*.) Plaintiff was not aware of this policy, and testified that had she been aware, she would not have met the student in the faculty lounge. (Lipschultz Dep. 29.) The Faculty Handbook addresses the lack of office space for adjunct professors to meet with students; however, the book does not mention anything about the use of the faculty lounge. (Handbook 3.) After the meeting with Dean Robbins, Plaintiff never met students in the faculty lounge. (Robbins Dep. 90.)

On December 1, 2014, Dean Robbins e-mailed Plaintiff, informing her that she would be conducting an in-class observation of Plaintiff the following day. (Dec. 1, 2014 E-mail, Pl.'s Resp. Ex. J.) Dean Robbins scheduled the in-class observation as part of Plaintiff's evaluation. (*Id*.)[3] The following day, Dean Robbins observed Plaintiff's 3:00 p.m. Spanish 101 class. (Dec. 1 E-mail; Lipschultz Eval., Pl.'s Resp. Ex. F; Robbins Dep. 90.) Dean Robbins's observation

---

[3] Plaintiff heard from one of her colleagues that adjuncts were generally provided more than a one-day notice for in-class observations. (Lipschultz Dep. 31.)

lasted approximately thirty minutes of the ninety-minute class. (Lipschultz Dep. 23-24.)[4] This is the shortest amount of time that Dean Robbins spent during an in-class observation of an adjunct professor. (Robbins Dep. 49.) On December 5, 2014, Plaintiff contacted Dean Robbins to inquire about classes for the following semester. (Pl.'s Resp. Ex. K.) Dean Robbins responded that one of her course sections may be cancelled due to under-enrollment, and that she would like to meet with Plaintiff the following week to go over the evaluation. (*Id.*)

On December 18, 2014, Dean Robbins, together with Assistant Dean Stokes-Duplass, met with Plaintiff in Dean Robbins's office. (Robbins Dep. 90-91.) Dean Robbins testified that the purpose of the meeting was to go over Plaintiff's evaluation and to inform Plaintiff that her adjunct position would not be renewed. (*Id*. at 91.) During the meeting, Dean Robbins provided Plaintiff with the evaluation, and informed Plaintiff that Holy Family would not be renewing her contract for the next semester because the evaluation "revealed several areas of concern." (*Id*. at 92.)[5] Specifically, Dean Robbins based her decision to not renew Plaintiff's contract on Plaintiff's syllabus, which was lacking key components, on the in-class observation of Plaintiff's Spanish 101 class, and on the fact that Plaintiff met with a student in the faculty lounge and commented on the student's performance in front of others. (Lipschultz Eval.)

With regard to the syllabus, Dean Robbins stated in Plaintiff's evaluation that:

> [Plaintiff's] syllabus is a single syllabus meant to cover two sections. The top of the syllabus lists both sections. Her course outcome objectives are not listed in standard format for Student Learning Outcomes, but are described in narrative

---

[4] Dean Robbins testified that she stayed to observe Plaintiff's classroom for approximately forty minutes to an hour. (Robbins Dep. 107.) At this stage, we must resolve all factual disputes in favor of Plaintiff.

[5] Out of the 120 adjuncts in the Arts and Sciences per semester, approximately eight to ten are not re-engaged. (Robbins Dep. 14-15.) More than half of those eight to ten adjunct professors not re-engaged choose not to return to Holy Family for other reasons—such as retirement—and not because the University has asked them not to return. (*Id*. at 16.)

>fashion.  There is no assessment grid indicating how these learning outcomes are measured.  The syllabus indicates that regular homework and a presentation are required, but these assignments are not described in the syllabus.  The Course Calendar lists chapters to be covered, but no topics are listed.  It is not indicated when the presentations are to be made.  There is also no time scheduled for oral testing which is a standard portion of SPAN 101.

(Lipschultz Eval.)

During her deposition, Dean Robbins was shown two other syllabi from Spanish 101 courses taught at Holy Family.  One of the syllabi belonged to Leticia Díaz.  (Robbins Dep. 122.)  Díaz's syllabus was provided to Plaintiff prior to the semester as a model off of which to base her own syllabus.  Similar to Plaintiff's syllabus, Díaz's syllabus contained course objectives in narrative format instead of in bullet points, failed to describe homework assignments, and failed to list topics in the course calendar.  (*Id*. at 122-24; Díaz Syllabus.)  Díaz's syllabus did, however, contain an assessment grid, while Plaintiff's syllabus did not.  (Díaz Syllabus; Lipschultz Syllabus.)  The other syllabus shown to Dean Robbins during her deposition belonged to a Spanish 101 instructor with the initials "S.W."  (Robbins Dep. 128-29; S.W. Syllabus, Pl.'s Resp. Ex. O.)  Similar to Plaintiff's syllabus, the syllabus for S.W. did not contain an assessment grid, described the course objectives in narrative format, failed to give details about the oral presentation, and did not list topics in the course calendar.  (S.W. Syllabus; Robbins Dep. 128-130.)  During her deposition, Dean Robbins initially testified that she knew who S.W. was, but then later stated that she did not feel comfortable identifying the adjunct professor based on the initials alone.  (Robbins Dep. 128-30.)  Because Dean Robbins refused to say who the syllabus belonged to, she also refused to state whether the professor was asked to return to Holy Family, despite having a syllabus that lacked key components as did Plaintiff's.  (*Id*.)

With regard to the in-class observation, Dean Robbins noted in the evaluation that Plaintiff

> teaches directly from the text. It was not clear from this observation what material had been added to the text to enhance student learning. She explains translations and often provides answers to her own questions. Students were asked to fill in blanks after potential answers to the text exercises were given in class. Students were then expected to write their answers on the white board.

(Lipschultz Eval.) In addition, Dean Robbins commented that students were texting during class, and that at least three students got up to leave the room, which she felt was disruptive. (Robbins Dep. 109.) Dean Robbins did not know whether they left to go to the bathroom, and conceded that Holy Family does not have a policy against students leaving the classroom during class. (*Id*.)

When Dean Robbins met with Plaintiff, she had already determined that Plaintiff's contract would not be renewed. (*Id*. at 91.) She made this determination without having reviewed Plaintiff's file from her previous ten years of teaching at Holy Family. (*Id*. at 68.) Plaintiff became emotional when Dean Robbins informed her about her termination. (Lipschultz Dep. 34.) Plaintiff asked Dean Robbins if that meant that she could never return as a professor. (*Id*. at 34-35.) Dean Robbins responded, "after all, you came back here under something like unusual circumstances." (*Id*.) Dean Robbins also testified that Plaintiff was not willing to address the problems identified by Robbins in her teaching style, and presented no plan to correct the problems. (Robbins Dep. 118-19.)

### B. Procedural History

On October 8, 2015, Plaintiff filed a Complaint in the Philadelphia Court of Common Pleas. (Compl.) The Complaint alleges claims for retaliation, in violation of the Age Discrimination in Employment Act ("ADEA") (Count I); retaliation in violation of the Pennsylvania Human Relations Act ("PHRA") (Count II); and violation of the public policy of

the Commonwealth of Pennsylvania (Count III).[6]  On October 23, 2015, Holy Family filed a Notice of Removal to this Court.  (Notice of Removal.)

On November 2, 2015, Holy Family filed a motion to dismiss Counts I and II on the basis of failure to exhaust administrative remedies.  (ECF No. 4.)  The motion to dismiss was subsequently withdrawn.  (ECF No. 12.)  On March 28, 2016, Holy Family filed an Answer to the Complaint.  (ECF No. 13.)

On September 7, 2016, Holy Family filed the instant Motion for Summary Judgment.  (Def.'s Mot., ECF No. 20; Def.'s Mem., ECF No. 20.)  On October 4, 2016, Plaintiff filed a Response in Opposition to Holy Family's Motion.  (Pl.'s Resp.)  On October 18, 2016, Holy Family filed a Reply.  (Def.'s Reply, ECF No. 23.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[A] factual dispute is material only if it might affect the outcome of the suit under governing law."  *Id.*  The court must view the evidence in the light most favorable to the non-moving party.  *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations, or mere suspicions" are insufficient to overcome a motion for summary judgment.  *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

---

[6] Plaintiff has conceded to the dismissal of her public policy claim.  (*See* Pl.'s Resp. 26.)

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## III. DISCUSSION

Plaintiff asserts retaliation claims against Holy Family under the ADEA and the PHRA, contending that she was terminated in retaliation for her prior lawsuit against the university alleging age discrimination. Holy Family argues that summary judgment should be granted because Plaintiff has failed to demonstrate a prima facie case of retaliation.[7]

The anti-retaliation provision of the ADEA states:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act.

---

[7] PHRA claims are treated the same as claims brought under federal anti-discrimination statutes as the analytical framework of an action under the PHRA is essentially identical to that of a claim under the ADEA. *See Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). We will therefore analyze the claims together.

29 U.S.C. § 623.

To establish a claim for retaliation under the ADEA, a plaintiff must show that "(1) she was engaged in protected activities; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 515-16 (3d Cir. 2004). Courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the ADEA. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192-93 (3d Cir. 2015). Under *McDonnell Douglas*, once a plaintiff makes out a prima facie case, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason" for the adverse action. *Id.* at 193. If the employer produces a legitimate reason, then "the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

### A. Plaintiff's Prima Facie Case of Retaliation under ADEA and PHRA

There is no dispute that Plaintiff's state court discrimination lawsuit constituted a protected employment activity. We will therefore address Defendants' arguments with respect to the second and third elements—whether Holy Family's non-renewal of Plaintiff's adjunct employment contract constituted an adverse employment action, and whether Plaintiff has demonstrated causation.

#### 1. *Adverse Employment Action*

To constitute an adverse employment action, Plaintiff must show that a reasonable employee would have found that the challenged actions were "'materially adverse' in that they

'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (quoting *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). This is an objective standard; we must evaluate the challenged action "from the perspective of a reasonable person in plaintiff's position, considering all of the circumstances." *Burlington*, 548 U.S. at 68.

Holy Family contends that its decision not to renew Plaintiff's adjunct teaching contract is qualitatively different than terminating Plaintiff, and therefore does not constitute an adverse employment action. This argument is not supported by the ADEA or by case law interpreting the ADEA. The anti-retaliation provision of the ADEA states that "[i]t shall be unlawful for an employer to discriminate against any of his employees or *applicants for employment* . . . because such individual . . . has made a charge . . . under this act." 29 U.S.C. § 623. The language presumes that individuals not yet employed, i.e., applicants, are also covered by the provision. Whether Plaintiff was terminated or whether she was simply not selected for contract renewal, the ADEA retaliation provision protects her.

In addition, Holy Family's argument that the non-renewal of Plaintiff's contract is not an adverse employment action has been rejected by courts both in this Circuit and in other Circuits. *See, e.g.*, *Lapinski v. Bd. of Educ.*, 163 F. App'x 157, 159 (3d Cir. 2006) (concluding that board of education's decision to not renew plaintiff's principal contract constituted an adverse employment action); *Leblanc v. Hill Sch.*, No. 14-1674, 2015 U.S. Dist. LEXIS 2981, at *22 (E.D. Pa. Jan. 12, 2015) (concluding that the plaintiff's non-renewal of her teaching contract constituted an adverse employment action for sex and age discrimination claims); *Kahan v. Slippery Rock Univ. of Pennsylvania*, 50 F. Supp. 3d 667, 687 (W.D. Pa. 2014) ("There can be no reasonable dispute that the non-renewal of [plaintiff's] one-year, probationary contract

qualifies as an adverse employment action."); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (holding that the refusal to rehire an individual following protected conduct may be a basis for a retaliation claim); *Chapkines v. New York Univ.*, 02-6355, 2005 U.S. Dist. LEXIS 1035, at *21-22 (S.D.N.Y. Jan. 19, 2005) (observing that the failure to reappoint an adjunct professor may constitute an adverse employment action); *Scroggins v. Troy Univ.*, No. 13-63, 2014 U.S. Dist. LEXIS 24763, at *42-43 (M.D. Ala. Feb. 26, 2014) (holding that university's decision not to renew adjunct professor's contract satisfied prima facie case of retaliation claim because "under well-established precedent, a decision to terminate an employee and a decision not to hire both constitute adverse employment actions"). Holy Family's decision not to renew Plaintiff's adjunct teaching contract constitutes an adverse employment action. Plaintiff has met the second element of her prima facie case.

    2.  *Causation*

  Holy Family argues that Plaintiff has failed to demonstrate a causal connection between her protected activity and her adverse employment action. Specifically, Holy Family contends that the period of time between Plaintiff's prior state court discrimination lawsuit and her termination does not support an inference of retaliatory animus. "To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if unusually suggestive." *Daniels*, 776 F.3d at 196-97 (citation and internal quotation marks omitted). While periods of days or weeks may be considered unusually suggestive, a period of many months is generally not. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat

summary judgment."). Here, Plaintiff filed her state court lawsuit in October 2013. She was advised that her adjunct contract would not be renewed in December 2014. This temporal proximity of fourteen months is not, on its face, unusually suggestive of retaliation. *See Daniels*, 776 F.3d at 198 (concluding that a period of ten months between protected activity and adverse action is not usually suggestive temporal proximity for purposes of establishing causation).

However, our analysis of causation does not end here. Holy Family's reliance on temporal proximity alone to disprove the element of causation is misplaced. Plaintiff's claim is not foreclosed simply because the temporal proximity is not unusually suggestive. *See Hill v. Barnacle*, 655 F. App'x 142, 147 (3d Cir. 2016) (noting that "[a] suggestive temporal proximity . . . is not itself an element of a retaliation claim and need not be alleged at the pleading stage"); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."). The Third Circuit considers "a broad array of evidence" when determining whether the plaintiff has sufficiently shown a causal link to survive summary judgment. *LeBoon*, 503 F.3d at 232 (citation omitted). The court has stated that:

> In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action. The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.[8]

*Daniels*, 776 F.3d at 196-97 (citations and internal quotation marks omitted).

---

[8] There is no dispute that Dean Robbins knew about Plaintiff's prior state court discrimination lawsuit and the Settlement Agreement when she terminated Plaintiff.

The record here contains evidence sufficient to support an inference of retaliation. Notably, the temporal proximity between Plaintiff's state court discrimination lawsuit and her termination—although not *unusually* suggestive—is at least suggestive of retaliation. The fourteenth-month time period relied on by Holy Family does not take into consideration the many months that Plaintiff was not employed at Holy Family. She was terminated the first time in May 2012. Pursuant to the Settlement Agreement, she returned to teach during the Fall 2014 semester, and was subsequently terminated again in December 2014, near the conclusion of the semester. Therefore, "it may be that a retaliatory decision . . . would not become apparent" until after Plaintiff returned to teach during the Fall semester. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792 (3d Cir. 2016). In other words, the facts support a plausible inference that Holy Family waited until the first opportunity it had to retaliate against Plaintiff—when it fulfilled its requirements under the Settlement Agreement. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (finding an inference of a causal connection where "the adverse action occurred at the first actual opportunity to retaliate"); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (concluding that a four-year gap between protected activity and adverse action "did not preclude a causal inference" because the plaintiff was not employed by the defendant for that entire period, and the defendant "took an adverse employment action against her on its first opportunity to do so").

In addition, the record contains other evidence that supports a causal connection. Holy Family provided inconsistent reasons to justify Plaintiff's termination as an adjunct professor. Holy Family's evaluation of Plaintiff outlined certain grounds for her termination: her inadequate syllabus, the issues in her teaching that were revealed during the in-class observation, and her meeting with a student in the faculty lounge. In its Motion for Summary Judgment, Holy

Family argued that its decision was also based on the fact that, during her meeting with Dean Robbins about the evaluation, Plaintiff was not "willing to address the problems Dr. Robbins found in the live-class evaluation nor had a plan on how to correct them." (Def.'s Mot. 9-10.) However, Deans Robbins testified that she had already decided prior to that meeting that Plaintiff was not going to be offered a contract for the following semester. In addition, Dean Robbins's response to Plaintiff that she had only returned to Holy Family "under unusual circumstances"—although not direct evidence of retaliation—certainly serves as circumstantial evidence that Holy Family provided inconsistent reasons to justify Plaintiff's termination.

When viewing all of this evidence, and considering "the circumstances as a whole," *Daniels*, 776 F.3d at 196, we are satisfied that Plaintiff has demonstrated causation. The timing of Plaintiff's termination shortly after Holy Family satisfied its obligation under the Settlement Agreement, coupled with Holy Family's inconsistent rationales to justify her termination, raises a plausible inference that Holy Family retaliated against Plaintiff for her filing of the state court discrimination lawsuit. Plaintiff has met her prima facie case of retaliation.

      **B.**     **Legitimate Non-Discriminatory Reason and Pretext**

Holy Family argues that it chose not to renew Plaintiff's contract due to Plaintiff's unsatisfactory classroom performance, her meeting with a student in the faculty lounge, and her implementation of a syllabus that failed to contain core components.

In order to establish pretext, Plaintiff must point to evidence that: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;" or that 2) permits the factfinder to reasonably conclude "that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).

With respect to the first prong, to discredit the employer's proffered reason, a plaintiff

> cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.

*Fuentes*, 32 F.3d at 765 (citations and internal quotation marks omitted); *see also Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016). "'[F]ederal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)); *see also Coulton v. Univ. of Pa.*, 237 F. App'x 741, 747 (3d Cir. 2007).

The same evidence that supported Plaintiff's prima facie case—notably, the timing of her termination as soon as the Holy Family's obligations under the Settlement Agreement were fulfilled and Holy Family's inconsistent justifications for terminating Plaintiff—also support Plaintiff's burden to show pretext.

In addition, evidence surrounding Plaintiff's in-class observation conducted by Dean Robbins also supports an inference of retaliatory animus. Dean Robbins testified that she only conducts one observation per semester, and only for "the more difficult cases" when the adjunct professor has been identified as "having problems." A reasonable juror may plausibly conclude that these facts support a finding that Holy Family's rationale for terminating Plaintiff was pretext for retaliation because Plaintiff was targeted as "having problems" even before the

complaints had arisen that ultimately led to her termination. In addition, Dean Robbins's specific criticism about Plaintiff's teaching style presents credibility issues that are better left for a jury. Plaintiff had a ten-year history of success as an adjunct professor, which is supported by the student evaluations and recommendation from the Dean. Despite this, Dean Robbins terminated Plaintiff because, *inter alia*, her class was "fairly one-dimensional with little interaction between teacher and students," she teaches directly from the text, and she provides answers to her own questions. However, a reasonable juror could conclude that these criticisms contradict other testimony given by Dean Robbins, and are otherwise arbitrary since they are not based on any written policy or criteria. For example, Dean Robbins criticized Plaintiff for not having a "diversity of pedagogies" yet also criticized her for having students write answers to questions on the white board in addition to reviewing answers to the questions in the textbook.

  Numerous inconsistencies concerning Plaintiff's syllabus as a justification for her termination also support an inference that Holy Family's proffered reasons were pretext for retaliation. Dean Robbins noted multiple complaints about Plaintiff's syllabus in her evaluation of Plaintiff. However, during her deposition, Dean Robbins indicated that despite these issues being raised in her evaluation—a document which ultimately formed the basis for her termination—they were merely "general comments" to the syllabus, not criticisms. (Robbins Dep. 96-102.) Many of the flaws identified in Plaintiff's syllabus were also found in the syllabus of Díaz, even though Dean Robbins provided Plaintiff with Díaz's syllabus as a model. Furthermore, despite these flaws, Plaintiff's syllabus was not flagged as problematic during Holy Family's pre-semester random audit of adjunct syllabi. Finally, the reason given that Plaintiff met a student in the faculty lounge also raises an inference of retaliation. Holy Family has no written policy forbidding professors from meeting with students in the faculty lounge. It is Dean

Robbins's policy, and adjunct professors only learn about the policy after they violate it and are subsequently put on notice by Dean Robbins.

Viewing the evidence in the light most favorable to Plaintiff, we are satisfied that Plaintiff has demonstrated weaknesses, inconsistencies, and contradictions in Holy Family's proffered rationale for terminating her. At the very least, there are genuine issues of material fact requiring a jury to evaluate the witness credibility of Dean Robbins. *See Anderson*, 477 U.S. at 255 (stating that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and are thus inappropriate at the summary judgment stage) (citation and internal quotation marks omitted).

### IV.   CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment will be denied.

An appropriate Order follows.

                                                          **BY THE COURT:**

                                                  _____

                                                  **R. BARCLAY SURRICK, J.**